```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4            v.                              17 CR 172 (JSR)
 5   EARL SIMMONS a/k/a "DMX",
 6                Defendant.
 7   ------------------------------x
                                              New York, N.Y.
 8                                            August 11, 2017
 9                                            11:15 a.m.
10
     Before:
11
                       HON. JED S. RAKOFF,
12
                                      District Judge
13
14                           APPEARANCES
15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     RICHARD COOPER
17        Assistant United States Attorney
18   THE LAW OFFICES OF MURRAY RICHMAN
          Attorneys for Defendant Simmons
19   MURRAY RICHMAN
     STACEY RICHMAN
20
21
22
23
24
25
```

```
 1              (Case called)
 2              MR. COOPER:  Good morning, your Honor.
 3              Richard Cooper, for the government.  With me at
 4    counsel table is U.S. Pretrial Services Officer John Moscado.
 5              THE COURT:  Good morning.
 6              MR. RICHMAN:  Murry Richman, for the defendant.  And
 7    assisted by --
 8              MS. RICHMAN:  Stacey Richman, your Honor.  Pleasure to
 9    see you.
10              THE COURT:  Good morning.
11              Where is your client?
12              MR. RICHMAN:  My client is on the highway, your Honor.
13    I just spoke with him.  He is on the Westside Highway coming
14    down with four people who are driving him down.  Very sorry
15    about this tardiness but we had spoken yesterday and he assured
16    me he would be here at 10:30 this morning although it was
17    scheduled for 11:00.
18              THE COURT:  Yes.  And I purposely took another short
19    matter first.
20              MR. RICHMAN:  I know that.
21              THE COURT:  So it's now 11:15.  He can't have made
22    much effort to be on time if he's not even here by 11:15.
23              MR. RICHMAN:  Your Honor, he's not in charge of his
24    own movements sometimes.  I had spoken with him late last
25    night.  He assured me that he would be here this morning by
```

1   10:30. I spoke with him again this morning. He again assured

2   me that he would be down here. I spoke with him not 12 minutes

3   ago. They were on the Westside Highway. According to the

4   estimated time of arrival, according to the GPS it was 11:32.

5   So I could only request additional time. I will try my best to

6   get him here on time.

7         THE COURT: Let me ask you, Mr. and Ms. Richman, have

8   you seen the report that the Pretrial Services officer sent to

9   this Court on August 9?

10         MR. RICHMAN: I have.

11         THE COURT: OK. All right. We will reconvene whether

12   your client is here or not at 11:40.

13         MS. RICHMAN: Thank you, your Honor.

14         MR. RICHMAN: Thank you, your Honor.

15         (Recess)

16         (Case Recalled)

17         MR. COOPER: Good morning, your Honor.

18         Richard Cooper, for the government. With me at

19   counsel table is U.S. Pretrial Services Officer John Moscado.

20         THE COURT: Good morning.

21         MR. RICHMAN: Good morning, your Honor.

22         Murray Richman, on behalf of the defendant. Assisted

23   by --

24         MS. RICHMAN: Stacey Richman.

25         Good morning, your Honor.

1            THE COURT:  Good morning.

2            MR. RICHMAN:  Mr. Simmons is present in court, your
3    Honor, with his apologies.  He started out, he lives in
4    Westchester County.  As a result of coming down, other people
5    driving, he came down and took a circuitous route and got here
6    late and I must apologize to the Court.

7            THE COURT:  All right.  So we're here because of
8    numerous alleged bail violations by the defendant.

9            The Court received two submissions.  One was a letter
10   dated August 9, 2017, from the government that indicated that
11   even though the defendant was released subject to obtaining
12   co-signatures on his bond which the first was to be obtained
13   originally by July 14 and that was extended several times until
14   July 20 but in fact, no co-signer was ever obtained.

15           Secondly, the government advised that the defendant
16   had traveled to St. Louis without permission.

17           On August 9 the Court also received a memorandum from
18   the Pretrial Services officer.  I'll read some of the pertinent
19   parts.

20           On July 17, 2017, Pretrial Services met with the
21   defendant and the conditions of bail were reviewed.  On the
22   same date a drug test was administered which proved positive
23   for cocaine.

24           At the defendant's request he was instructed to report
25   to Pretrial Services in White Plains on July 20 at two p.m.

However, he failed to report as directed.

On July 21 the defendant met with Pretrial Services. Pretrial Services offered the defendant drug treatment options but he indicated he can stay drug free on his own and does not need treatment. On that date Pretrial Services administered a drug test which proved positive for cocaine.

The defendant was instructed to report again in-person on July 24. On July 24 Pretrial Services contacted the defendant via telephone and he stated he was in Chicago. Pretrial Services inquired if the Court gave him permission to travel there. The defendant stated that it was discussed in court and that the Court had given permission for him to travel.

Let me pause there to recite what in fact was said in court. This is from the transcript of the hearing before this Court on July 17. After Mr. Richman had raised the question of Mr. Simmons' travel the Court stated:

"If you both agree, meaning the government and the defense, and the Pretrial Services officers agree, you don't even have to run it by me. But if there is any disagreement on the part of anyone, then of course, you need to bring it to my attention."

It's clear from what I just read that this trip to Chicago was not brought to the attention of the Pretrial Services officer in advance and I have no indication that it

was brought to the attention of the government or that the government had issued its approval.

Going back to the memo from Pretrial Services.

The defendant reported in person on July 26. A drug test was administered and the results were positive for marijuana, cocaine and opiates. Pretrial Services confronted the defendant about the results of the drug screening and he denied drug use. However, he indicated that he had an opiates prescription as a result of an injury he sustained while performing in Chicago. The defendant provided a copy of such prescription to Pretrial Services.

On July 28, 2017, Pretrial Services instructed the defendant to remain in his residence on July 31 as Pretrial Services would be visiting him at home.

On July 29 the defendant left a telephone message indicating that he was traveling to St. Louis as he had a family emergency. The defendant returned to New York on August 3. It should be noted that neither the government, nor our office, that is, the Pretrial Services Office, gave the defendant permission to travel out of the district.

Skipping ahead, the defendant last reported to our office on August 7. On that day the defendant was drug tested and the results were positive for cocaine, marijuana and opiates.

So if those allegations are true then it would appear

1  that Mr. Simmons has violated the terms of his Pretrial release
2  not once, not twice but many times, probably more times than I
3  can ever remember a defendant having violated the terms of his
4  Pretrial Services release in such a short period.  This gives
5  the Court very little confidence that he should be released at
6  all.
7           But let me hear from defense counsel.
8           MR. RICHMAN:  Your Honor, I've worked with Mr. Simmons
9  for the past 25 years.  He's always appeared in the various
10 cases that he's been involved in.  There's been various cases.
11 Most of them quite minor.
12          THE COURT:  Yes.  He has an extensive rap sheet,
13 mostly for minor matters but not all.  I was looking at that.
14 For example, he was found guilty or pled guilty in 2002 to
15 possession with intent to distribute drugs.  Now, it wasn't
16 that major an offense.  He was given probation.  He was also
17 found guilty on March 15, 2002, of lawful possession of a
18 weapon, namely, a handgun.  He was found guilty on December 19,
19 2002, of attempted criminal possession of a weapon.  There were
20 enumerable minor offenses.  He was in 2004 convicted upon a
21 plea of guilty to operating a motor vehicle while impaired by
22 drugs.  He was convicted in 2008 of possession of a loaded
23 firearm and he was convicted in January 2009 of narcotics and
24 drugs possession.
25          He was convicted in 2008 of, appears it was likely

possession of cocaine. He was convicted of in 2011 of what's marked as aggravated unlicensed operation of a motor vehicle. It's unclear what was involved there. The charge but not the plea was a charge of criminal possession of a loaded firearm and criminal possession of a controlled substance. He was convicted in various times before and after of various other less significant offenses.

So, yes, he doesn't have a rap sheet that indicates major felony convictions. He does have a rap sheet that at least suggests more than a passing acquaintance with illegal drugs and more than a passing acquaintance with handguns.

But I interrupted you. Go ahead.

MR. RICHMAN: Your Honor, you can always interrupt me. I have no standing here.

Most respectfully, I've known Mr. Simmons 25 years. Yes, all of those things are true. All of those things have been as a result of his problem with substance --

THE COURT: Which, here I go again. Forgive me again -- which he told Pretrial Services he had under control and could handle on his own.

MR. RICHMAN: You know --

THE COURT: It sounds like total self-denial.

MR. RICHMAN: So much of life is self-denial. So much of us will go through all our lives is self-denial. He is no different than the rest of us in that particular area. I

1  recognize that. I've known him. When I'm sitting there and
2  rationalizing and working with him, he is a very rational and
3  decent human being, surprisingly intelligent and concerning. I
4  sometimes feel that if placed in custody would just destroy
5  everything here. We couldn't properly prepare this case. He
6  could properly handle this case. There would be no way. You
7  know, I sometimes feel that judges who put people in jail in
8  terms of anticipation of going to trial or facing the before
9  trial don't realize the burden that's on the defense, on the
10 ability to actually prepare this case.
11         Mr. Simmons is a decent human being who is caught up
12 with a problem. I think there are circumstances that can be
13 adequately provided to keep him out, to keep him performing,
14 keep him earning, keep him supporting his numerous children
15 that he's had and at the same time give him some support in
16 terms of his drug problem. It's a problem that he says he's
17 gotten under control. We know better. We hope better. He
18 tells us that it's all as a result of prior use prior to his
19 arrest. It takes 30 days to get out of his system. I really
20 don't know enough about it but I do know to the extent that he
21 does need help. I've spoken with the Pretrial Services officer
22 who has suggested a program can be interspaced with the ability
23 for him to perform and at the same time going to the outpatient
24 program and working closer with the Pretrial Services program.
25         As for, incarceration would only just wreck the entire

1     structure of family support and direct devastation on the

2     children that he has in his family that he has to support.

3            THE COURT:  What was this supposed family emergency?

4            MR. RICHMAN:  I have no problem discussing the family

5     emergency in camera with your Honor but I think it really

6     should not be done for public record and it's a personal family

7     difficulty.  It involves the woman he is with now, his fiance

8     who comes from St. Louis that --

9            THE COURT:  All right.  You don't have to give me more

10    details at this point.

11           Let me hear from the government.

12           MR. COOPER:  Your Honor, we had prior to the

13    defendant's presentment and arraignment background concerns

14    about his ability to comply with conditions giving, as your

15    Honor cited, the history here, the rap sheet and the nature of

16    this crime which involved, essentially, a scheme to conceal and

17    to go off the radar and lead an entirely cash lifestyle, as we

18    allege in part to avoid complying with his tax obligations.

19    Over those background concerns, the fact that he surrendered

20    when notified that there were charges pending against him

21    certainly went a long way for us in speaking with Mr. Richman

22    and agreeing to propose to the Court a condition, a set of

23    conditions for bail.

24           The violations are very troubling.  Just as troubling

25    as the substance abuse is to us is leaving the district without

1       getting permission from Pretrial and from the government which

2       to the extent there's no justification for that, it raises

3       serious concerns about his ability to comply.

4                 To be clear, the concern about risk of flight is

5       not --

6                 THE COURT:  He did it twice.  One time saying that it

7       was a family emergency and that it took precedent over even

8       having to call you or Pretrial Services which would have taken

9       maybe two minutes of his time to seek permission but he didn't

10      do that.  And the other time claiming, as the Court record

11      contradicts, that he had received permission from this Court.

12      So in addition, it sounds like he's a liar.

13                MR. COOPER:  Your Honor, all of those things are

14      troubling and that in part motivated our desire for the Court

15      to impose more restrictive conditions on the defendant because

16      he's shown an inability to comply.

17                And the only other point I would make to your Honor is

18      our concern about risk of flight is not only that he is going

19      to essentially take off and go on the lamb and we won't be able

20      to find him, but it's that by failing to comply it imposes a

21      burden on everybody, on the government in the event he misses a

22      court conference and we have to obtain a warrant and

23      potentially work with the marshals and with law enforcement

24      agencies to go out and locate him and to bring him to court.

25      It imposes --

1          THE COURT: My heart doesn't exactly bleed for your
2     having to do that. The government does that all the time.
3          MR. COOPER: Well, that's true, your Honor, but it's
4     certainly, the point is that risk of flight is not only
5     fleeing, going on the lamb. It's risk of nonappearance in the
6     court and having to compel or otherwise take additional steps
7     to obtain --
8          THE COURT: Why appear in court when you're stuck on
9     the Westside Highway?
10         MR. COOPER: The other point, your Honor, is it also
11    imposes significant additional burdens on the Pretrial Services
12    agency to have to chase after the defendant and attempt to
13    ensure his compliance with conditions. Those are all the
14    factors motivating our request that the Court impose more
15    restrictive conditions on the defendant.
16         THE COURT: So let me ask Mr. Richman, if instead of
17    detaining him at a known address, namely, the local jail, I
18    were to impose home confinement subject to certain limitations,
19    where would that be?
20         MR. RICHMAN: It would be in Westchester County.
21         THE COURT: What's the address?
22         MR. RICHMAN: Your Honor, most respectfully, I would
23    give it to the Court without hesitation. If it becomes public
24    we'll be bombarded with thousands of people.
25         THE COURT: All right. Well, what I want to know is

1   this, this is a home or an apartment?  What is it?
2            MR. RICHMAN:  A house, your Honor.
3            THE COURT:  How long has he been there?
4            MR. RICHMAN:  Over a year, your Honor.
5            THE COURT:  Is he the owner?
6            MR. RICHMAN:  No, he's not.  He rents the house.
7            THE COURT:  How long is the lease?
8            MR. RICHMAN:  He has another year, your Honor,
9   two-year lease.  I'm preparing the address for you in camera.
10           THE COURT:  Yes.
11           MR. RICHMAN:  One of the problems we have is just to
12  flesh out for the record, the U.S. Attorney's Office has been
13  directing -- to be quite candid with you, I have no argument at
14  all with the prosecution.  They have been reasonable.  We've
15  worked together.  We've spoken together.  I've spoken to him
16  more than I even speak to my client.  And when we received the
17  call at two o'clock in the afternoon to produce my client,
18  within two and a half hours I had my client down here and in
19  the courthouse.  We couldn't arraign him that day because the
20  magistrate had left the building at that time.  We had him held
21  over the next day and arraigned him the following morning with
22  no difficulty at all.  He was produced.
23           May I just approach and give you this?
24           THE COURT:  Yes.
25           (Pause)

1           MR. RICHMAN:  He's producing records at the present
2   time.  He goes out and does his music.  His music is done
3   usually in the evenings when they go to the studio with his
4   group and the people who are supporting him.  They do music and
5   they have shows periodically.  We gave a list of the shows on
6   several occasions to the prosecution.  The prosecution told me
7   just prepare the list in advance and which I'm in the process
8   of doing.  On the day of the arraignment I had that list with
9   me and he said just send it to me.  And that list really
10  anticipates September, October and November for the shows that
11  he is going to be performing.  He's booked for those shows.  He
12  will be working in that capacity subject to the Court's
13  approval, obviously.
14          But I think he has learned his lesson.  I think he has
15  learned --
16          THE COURT:  You know, I wonder a little bit about that
17  because thanks to your typically superlative efforts, he has
18  largely escaped any jail time or prison time despite this very
19  extensive rap sheet and so I wonder whether he really has
20  learned any lesson.  The lesson he seems to have learned as
21  illustrated by his behavior over the last few weeks is that he
22  is free to thumb his nose at the Court and at the Pretrial
23  Services because his experience is that Murray Richman will
24  always get him off.  That seems to be the only lesson he's
25  learned.

MR. RICHMAN: Your Honor, I'm flattered with the suggestion. I would suggest to you there may be other reasons here. I'm going to -- and I suggest to the U.S. attorney that there may be some medical reasons involved which I will be submitting to the Court by way of a written report that once you review the report you may understand what the problem may actually be. I don't want to take full credit. While it's flattering, this is a substance person here, a very good person. And I would ask that the Court, you've understood the burden. He's tried to comply. He doesn't really deserve the consideration but I'm asking for the consideration, nevertheless.

The Pretrial Services officer has been terrific. We have been in communication. I wish they would also be in communication with him to the same degree that I can communicate with him. Maybe I should just be adding to the mix that when they call him, just to call me and I'll make those things happen. It seems that sometimes it's difficult for them to get things through his head but it gets through his head and that's one of the things I want to submit to you as the reason why it may not be able to get through his head.

THE COURT: Well, I'm going to not detain him in jail. Although, I think a very strong argument could be made for detaining him in jail.

The reason I'm not is first, I think you're quite

right, Mr. Richman, that a case of this sort, a relatively complicated and complex case is not one one can easily prepare if your client is in jail. So I think that weighs heavenly in the balance.

I also think that we are often much to quick in this country to lock people up before trial, not to mention after trial. And while he certainly had made one of the better cases for locking himself up, I think one has to look at the broader picture.

The really broader picture is that I think there is a set of conditions that will assure his reappearance in court and that is the real bottom line under our Constitution. Our Constitution says that if there are reasonable bases for assuring the reappearance of a defendant prior to trial, that trumps all the other factors and that's what weighs in the end most heavily with this Court.

So he is going to be starting immediately, that is to say, as soon as he can get back home today, subject to home confinement seven days a week, 24 hours a day, except upon further expressed permission of the Court, not Pretrial Services, not the government, though I will want them to be notified and I will have input from them. But only if I agree to his release in advance can he even go outside to water the lawn.

In terms of his drug problem which is gross, Pretrial

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Services will arrange an appropriate drug treatment program and
2   submit it to the Court for the Court's approval.
3           In terms of travel for any reason, family emergency,
4   business, whatever, I'm not going to approve anything that
5   isn't submitted to me at least a week in advance.
6           In terms of medical situation, Mr. Richman, you'll
7   submit what you want to submit and I'll deal with that.
8           MR. RICHMAN:  Yes, your Honor.
9           THE COURT:  In terms of a co-signer signing a bond,
10  I'm going to eliminate that condition.  I think that is just
11  unnecessary given the home confinement.
12          All the standard conditions will apply.  No possession
13  of guns, no use of drugs, et cetera, all of the standard
14  conditions.  All right?
15          MR. RICHMAN:  Respectfully, one further?
16          THE COURT:  Yes.
17          MR. RICHMAN:  Counsel visits, working with counsel and
18  reviewing materials from the court for the preparation of
19  trial --
20          THE COURT:  Yes.
21          MR. RICHMAN:  -- will we have to notify the Court in
22  advance when he is coming to my office?
23          THE COURT:  Since I'm not imposing electronic
24  monitoring, the reason why I'm not is because that is very
25  expensive for the government.  If he winds up fleeing, then I

1    will first of all be -- everything you've said about his
2    character I will now know is false but more importantly is I'm
3    sure the government will trace him down worldwide.  It will be
4    the end of his career and the end of his living a decent life.
5            So given all of that, Mr. Richman, if he is meeting
6    personally with you or your daughter but no one else except
7    upon prior authorization of the Court and if the meetings
8    include no time other than the genuine travel time to your
9    office, whatever time is spent in the office and then the
10   return, you don't have to notify the Court in advance as to
11   that.  You do have to notify Pretrial Services.
12           MR. RICHMAN:  Thank you, your Honor.
13           MR. MOSCADO:  Your Honor?
14           THE COURT:  Yes.
15           MR. MOSCADO:  May I request or recommend that the
16   condition of home incarceration be enforced with location
17   monitoring?
18           THE COURT:  OK.  The only reason I wasn't imposing
19   that is because I know it's a, I think the legal term is "pain
20   in the butt" for you guys.  But if you think this is an
21   appropriate case I will include that.  So we will include that
22   as well.
23           MR. MOSCADO:  Thank you.
24           MR. RICHMAN:  Sorry.  Including the Pretrial Services
25   reporting?

1           THE COURT:  Including electronic monitoring of his
2    home confinement.  So he'll wind up wearing an ankle bracelet
3    or something of that sort.
4           MR. RICHMAN:  The question was just posed to me that
5    it had been suggested by the Pretrial Services officer to see a
6    doctor or a program with relation to drug treatment.  That will
7    be continued with the Pretrial Services officer, I imagine?
8           THE COURT:  Yes.
9           OK.  Anything else?
10          MR. COOPER:  Not from the government.
11          Thank you, your Honor.
12          MR. RICHMAN:  Nothing from defense, your Honor.
13          Thank you.
14          THE COURT:  All right.  Very good.
15                            (Adjourned)